1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

PAUL CLARK, individually, and on behalf of other members of the general public similarly situated,

               Plaintiffs,

v.

QG PRINTING II, LLC, a Connecticut limited liability company; QUAD/GRAPHICS, INC., a Wisconsin corporation; and DOES 1 through 10, inclusive,

               Defendants.

Case No. 1:18-cv-00899-AWI-EPG

**ORDER ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

(Doc. No. 46)

Plaintiff Paul Clark has brought suit against Defendants Quad/Graphics, Inc. ("QG") and QG Printing II, LLC ("QG Printing") in connection with alleged wage-and-hour violations at four commercial printing facilities in California, including claims relating to meal breaks, rest breaks, off-the-clock work and business expenses.

Before the Court is Plaintiff's motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. See Doc. No. 46. For the reasons that follow, Plaintiff's certification motion will be granted, in part, and denied, in part.

## BACKGROUND

### I.     Parties

QG is a Wisconsin corporation with commercial printing facilities throughout the United States. Doc. No. 49, Part II.A.1. QG Printing is a Connecticut limited liability company and a QG

1   subsidiary.[1] Id.

2       QG Printing operates four facilities in California: Merced, West Sacramento, Riverside –

3   Jurupa Valley ("Jurupa Valley"), and Riverside – Box Springs ("Box Springs"). Doc. No. 49, Part

4   II.A.1. The Merced facility has both a press production area and a finishing area. Id. Employees in

5   the press production area work in crews to run large printing presses. Id. Products are bound,

6   bundled, collated and placed on pallets in the finishing area. Id. West Sacramento, Jurupa Valley

7   and Box Springs each has a press production area but no finishing area. Id.

8       Plaintiff was a non-exempt, hourly-paid press assistant in the press production area at QG

9   Printing's Merced facility from June 2017 until April 2018.[2] Doc. No. 34 ¶ 5. Plaintiff worked

10  approximately 12 hours per day, five days per week. Id. Plaintiff—and his fellow press

11  assistants—worked under the supervision of press operators. Doc. No. 46-1, Part II.B.

12  **II.    Procedural History**

13      Plaintiff filed this class action in Merced County Superior Court on May 29, 2018, seeking

14  to represent an overarching class of several hundred non-exempt, hourly employees who worked

15  in QG Printing's California facilities in the four-year period prior to the filing of the action. Doc.

16  No. 1. Defendant removed the action to this judicial district on June 29, 2018, id., and it was

17  assigned to this Court on July 2, 2018. Doc. No. 7.

18      The 2AC was filed on September 23, 2019 and alleges claims for violations of: (i)

19  California Labor Code ("Labor Code") §§ 510 and 1198 (Unpaid Overtime); (ii) Labor Code §§

20  1182.12, 1194, 1197, 1197.1, and 1198 (Unpaid Minimum Wages); (iii) Labor Code §§ 226.7,

21  512(a), and 1198 (Failure to Provide Meal Periods); (iv) Labor Code §§ 226.7 and 1198 (Failure

22  to Provide Rest Periods); (v) Labor Code §§ 226(a), 1174(d), and 1198 (Non-Compliant Wage

23

24     [1] Defendants contend that Plaintiff has failed to show that QG was a joint employer for purposes of liability in this

25  action. Doc. No. 49, page 10 of 43, n.2. That issue need not be addressed—and is not addressed—in this Order. The Court's occasional references to "Defendants" track the allegations in the Second Amended Complaint ("2AC") (the

26  operative pleading in this action) and are not intended to convey a view on whether QG is has potential liability in connection with one of more of Plaintiff's claims.

27     [2] The Court notes that work history records filed by Plaintiff in support of the instant motion appear to show that

28  Plaintiff's last day of active work for QG Printing was December 5, 2017, although he apparently remained on staff through April 2018 in connection with a workplace injury. Doc. No. 46-2, Ex. G.

Statements and Failure to Maintain Payroll Records); (vi) Labor Code §§ 201, 202, and 203 (Wages Not Timely Paid Upon Termination); (vii) Labor Code § 2802 (Unreimbursed Business Expenses); (viii) Labor Code §§ 551, 552, and 558 (Failure to Provide One Day of Rest in Seven); (ix) Labor Code §§ 2698, et seq. (Private Attorney General Act or "PAGA"); and (x) California Business & Professions Code ("Business & Professions Code") §§ 17200, et seq. (Unlawful or Unfair Business Practices). Doc. No. 34.

Plaintiff now brings a motion pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure[3] to certify the overarching class and the following subclasses:

- First Meal Break Subclass: Putative class members who worked at least one shift of more than six hours, in connection with claims that QG Printing "chronically understaffs its printing facilities in California while imposing strict deadlines which impede and discourage subclass members from taking, timely uninterrupted and compliant first meal breaks in shifts over six hours";

- Second Meal Break Subclass: Putative class members who worked at least one shift of more than 12 hours, in connection with claims that Defendants had a "a class-wide policy and practice of failing to provide second meal breaks";

- Rest Break Subclass: Putative class members who worked at least one shift of more than 3.5 hours, in connection with claims that subclass members were unlawfully deprived of rest breaks due to "Defendants' practices and procedures requiring employees to remain on premises for rest breaks and chronic understaffing";

- Meal Break Waiver Subclass: Putative class members who worked at least one shift between five and six hours in length or at least one shift between 10 and 12 hours in length, in connection with claims that Defendants use invalid, blanket meal waivers to deprive employees of a first meal break between the fifth and sixth hour of work and to deprive employees of a second meal break between the tenth and twelfth hours of work;

- Off-the-Clock Work Subclass: Putative class members who arrived to work early, in

---

[3] Unless otherwise noted, "Rule," as used herein, refers to the Federal Rules of Civil Procedure.

connection with claims that Defendants maintained a class-wide policy of requiring employees to determine their assigned workstation by watching a scrolling monitor prior to clocking in for a shift; and

- Business Expense Subclass: Putative class members who purchased steel-toed boots for use while working for Defendants, in connection with claims that QG Printing did not provide legally sufficient reimbursement for such purchases.

Doc. Nos. 46 and 46-1. In addition, Plaintiff seeks to certify what he refers to as a "Derivative Claims Subclass" comprising "claims pursuant to Labor Code sections 510, 1198, 1194, 1997, 1197.1, 201, 202, 203, 204, and 226, and Business & Professions Code section 17200, et seq." that are "entirely or partially derivative of the putative class claims" corresponding to the subclasses listed above. Id.

## III.   Summary of Relevant Facts

Plaintiff submitted several declarations, as well as an expert report, his QG Printing work history, excerpts from several deposition transcripts and various other documents in support of his motion. See Doc. No. 46-2.

### A.   Declarations Filed by Plaintiff in Support of Motion

Plaintiff provides 16 declarations from putative class members. Doc. No. 46-1, Ex. B. Twelve of the 16 declarations are from the Merced facility; three are from the West Sacramento facility; and one is from the Jurupa Valley facility. Id. There is no declaration from the Box Springs facility. Id.

#### 1.   Jurupa Valley Declaration

Troy Bradley (the "Jurupa Valley Declarant") worked five 12-hour shifts per week as a press assistant in the press production area in Jurupa Valley from June 2017 to November 2017.

Bradley was deprived of a proper first meal break "approximately two [] times" during the seven months or so that he was employed by QG Printing, due to "insufficient staffing and a demanding workload."

Bradley states that there was "no policy for scheduling second meal periods and [] no practice of permitting [him] or other employees to take a second 30-minute meal period." As a

1  result, Bradley was not provided a second 30-minute meal period on days he worked in excess of

2  10 hours.

3        Bradley was deprived of five proper rest breaks each week "because QG had a policy of

4  failing to schedule rest breaks, assigning a heavy workload, and insufficiently staffing shifts."

5        Bradley worked off-the-clock approximately once per month because "[m]anagement

6  required that [he] know [his] printer assignment before going down to the floor" and because "he

7  would often begin working before [his] scheduled start time so that [he] could take an online

8  safety training course."

9        Bradley spent "about $150.00 on steel-toed boots" for work.

10              2.      <u>West Sacramento Declarations</u>

11        Declarations from the West Sacramento facility were provided by Sepin Langrin, Ronald

12  Newman and Rafael Piña Santana (together, the "West Sacramento Declarants"). Langrin worked

13  five 8- to 12-hour shifts per week from January 2017 to May 2017. Newman worked five 12-hour

14  shifts per week from August 2014 to June 2015. And Piña Santana has worked five 8-hour shifts a

15  week since March 2018.

16                    a.      *First Meal Breaks*

17        Langrin did not receive a proper first meal break once per month. Newman did not receive

18  a proper first meal break 3 times a week. Both Langrin and Newman state that this was due to

19  "insufficient staffing and [a] demanding workload." Piña Santana makes no statement regarding

20  first meal breaks.

21                    b.      *Second Meal Breaks*

22        Langrin makes no statement as to second meal breaks. Newman does not indicate how

23  often he was deprived of a second meal break (if ever), but states that "management had no policy

24  for scheduling second meal periods and would only permit [] employees to take a second 30-

25  minute meal period when there was adequate staffing." Piña Santana states that employees "are

26  provided with a 20-25 minute second meal period" but does not state how frequently he was

27  deprived of a second mean break (if ever).

28

1              *c.*     *Rest Breaks*

2       Langrin was unable to take a proper rest break twice per week "because the workload was

3 too busy, there was insufficient staff, and QG required employees to remain on-site to physically

4 observe ongoing projects." Newman was unable to take a proper rest break five times per week

5 due to "a policy of failing to schedule rest breaks[] and insufficient staff." Piña Santana was

6 unable to take a proper rest break two to three times per month because "the workload was too

7 busy."

8              *d.*     *Off-the-Clock Work*

9       Langrin worked off-the-clock for 30 minutes once or twice per month, checking his

10 assignment and communicating "with supervisors and other employees to discuss ongoing issues."

11 Newman cleaned up his work area after clocking out three times per week. Piña Santana makes no

12 statement regarding off-the-clock work.

13              *e.*     *Steel-Toed Boots*

14       Langrin spent $200 and Piña Santana spent $400 on steel-toed boots for work. Newman

15 makes no statement regarding steel-toed boots.

16          3.     <u>Merced Declarations</u>

17       Relevant statements from the 12 declarants employed at QG Printing's Merced facility

18 ("Merced Declarants")[4] are as follows:

19              *a.*     *First Meal Breaks*

20       All 12 Merced Declarants state that they were deprived of first meal breaks to some extent

21

22

---

23 [4] Edward Avila has worked five or six 12-hour shifts per week in the press production area from October 2015 to the present. Edwin Bazan worked six or seven 8-hour shifts per week in the finishing area from April 2018 to October 2018. Nicholas Bauer worked six or seven 8- to 12-hour shifts per week in the finishing area from June 2018 through November 2018. Guy Belt worked five to six 12-hour shifts per week as a forklift operator from November 2006 to January 2016. Andrea Cortes worked two to five 8-hour shifts per week in the finishing area from January 2018 through March 2018. Andres Farias has worked two to seven 12-hour shifts per week in the press production area from July 2016 to the present. Erika Longoria worked seven 8-hour shifts per week in the press production area from November 2016 to December 2016. Matthew Myers worked five to six 12-hour shifts per week in the press production area from April 2017 to August 2019. Ronald Perez worked four 8- to 9-hour shifts per week in the finishing area from October 2016 through August 2017. Jayson Sanderson worked five 12-hour shifts per week in the press production area from July 2015 to April 2018. Christopher Soria worked five 8- to 12-hour shifts per week in the finishing department from 2007 to 2014. Randy Waterbeck worked five to seven 12-hour shifts per week in the press production area from March 2000 to July 2016.

but the rate at which Merced Declarants were deprived of meal breaks varied. On one end of the spectrum, Bazan and Longoria state they were unable to take proper meal breaks once a month. On the other end of the spectrum, Avila and Waterbeck state they were unable to take a proper first meal break more or less every day that they worked. The remaining Merced Declarants were unable to take proper first meal breaks between two times and four times per week. All of the Merced Declarants more or less attribute the lack of proper first meal breaks to some combination of insufficient staffing, heavy workload and requests from supervisors to perform work while on break.

b.    Second Meal Breaks

Bazan, Cortes and Longoria make no statement regarding second meal breaks. The other Merced Declarants state that they were not provided a second meal break because QG Printing had no policy for scheduling—and no practice of permitting employees to take—second meal breaks.

c.    Rest Breaks

All 12 Merced Declarants were unable to take proper rest breaks to some extent, but the rate at which they were unable to take proper rest breaks varied. On one end of the spectrum, Longoria was unable to take proper rest breaks once every other week, Waterbeck was unable to take proper rest breaks once or twice a week, and Cortes was unable to take proper rest breaks twice a week. On the other end of the spectrum, Sanderson was unable to take proper rest breaks 10 times per week. The other Merced Declarants fell within that range and were unable to take proper rest breaks at rates of three to four times per week, four to five times per week and seven to eight times per week. All of the Merced Declarants state that they were deprived of rest breaks because QG Printing failed to schedule rest breaks, assigned a demanding workload and / or had insufficient staff, and nine Merced Declarants state that employees were required to remain on-site during rest breaks.

d.    Off-the-Clock Work

Avila states that he worked off-the-clock prior to his shift six times per week because he was required to determine his printer assignment before commencing work and because he "often begin[s] working before [his] scheduled start time so that [he] can communicate with employees to

7

discuss ongoing issues." Perez states that he worked off-the-clock with unspecified frequency because he was required to determine his printer assignment before commencing work and because he "would often begin working before [his] scheduled start time so that [he] could prepare [his] equipment." Sanderson states that he worked off-the-clock five times per week because he was not compensated for the time it took to put on his uniform, which was stored in a locker at work. Soria states that he worked off-the-clock five times per week because he was required to determine his printer assignment before commencing work and because he often started working before his scheduled start time so he could "prepare [his] tools, check his assignment and communicate with employees to discuss ongoing issues."

Belt, Myers and Waterbeck state that they worked through meal breaks from one to four times week, but none of them claims to have worked off-the-clock prior to a shift.

Bazan, Baur, Cortes and Farias make no statement at all regarding off-the-clock work.

### e.   Steel-Toed Boots

Eight of the 12 Merced Declarants state that they spent amounts in excess of $50 on steel-toed boots for work, with spend ranging from about $60 to about $350 per year, after loosely adjusting for imputed frequency of purchases (to the extent possible based on information in the declarations). Bazan, Baur, Belt and Waterbeck make no statement regarding expenditures on steel-toed boots.

### B.   Plaintiff's Deposition Testimony

Plaintiff affirmed in deposition testimony that it was QG Printing's policy to "take a lunch break" prior to the end of the fifth hour of work. Doc. No. 46-2, Ex. C. Further, he testified that he skipped rest breaks "a lot," but that no supervisor instructed or encouraged him not to take a rest break or a lunch break. Id. As to off-the-clock work, Plaintiff testified that he was allowed to clock in ahead of his shift to have time to look at the assignment board, but he could not recall how much time he was given to do so. Id. Finally, Plaintiff stated that he never clocked out for a second meal break. Id.

### C.   Plaintiff's Expert Report

Plaintiff's expert reviewed timekeeping records for a period of approximately five years from May 29, 2014 through July 14, 2019 for 1,195 employees and a total of 575,659 shifts across QG Printing's four California facilities.[5] Doc. No. 46-2, Ex. A. The following is a summary of his findings with respect to issues relevant to this motion.

### 1.   First Meal Breaks

535,304 shifts corresponding to 1,186 employees were greater than six hours in length. Of those 535,304 shifts, 21,724 did not exhibit a first meal period; 46,464 exhibited a first meal period that was shorter than 30 minutes in length; and 111,258 exhibited a first meal period that "commenced after the end of the fifth hour of work (i.e., the first segment of work lasted longer than 5 hours before the first clock-out punch)."

Based on these data, it appears that about 96% of shifts in excess of 6 hours had a first meal break of some sort, but that 9% of first meal breaks were shorter than 30 minutes and that 22% of first meal breaks were taken after the end of the fifth hour of work. Further, the Court reads the report to show that between 16% and about a third of shifts over six hours involved some sort of first meal break violation (or, conversely, that between two thirds and 84% of shifts over six hours did not involve a first meal break violation), depending on the degree of overlap between the "less than 30 minutes" category and the "after the end of the fifth hour of work" category.

Moreover, the data appear to show that there were 18,354 shifts that were greater than five hours in length but not greater than six hours in length, and that 15,525 of the missed first breaks attributed to shifts greater than five hours in length occurred in shifts that were not greater than six hours in length. Thus, first meal breaks were missed in 97% of shifts between five and six hours in length, but in only 4% of shifts in excess of six hours in length.

### 2.   Second Meal Breaks

375,777 shifts corresponding to 1,073 employees were greater than 10 hours in length. Of these shifts, 373,981 did not exhibit a second meal period, 247 exhibited a second meal period that was shorter than 30 minutes in length, and 50 exhibited a second meal period that commenced

---

[5] Defendants contend that these timekeeping records only cover employees in press production areas and, thus, do not include employees in the finishing area in the Merced facility. Doc. No. 49, page 13 of 43, n.4.

"after the end of the tenth hour of work." Thus, more than 99% of shifts in excess of 10 hours lacked a second meal break completely.

10,263 shifts were greater than 12 hours in length, accounting for 1.8% of the shifts in the data set of 575,659 shifts used by Plaintiff's expert.

### 3. Other

Plaintiff's expert calculates that the 1,194 Class Members were entitled to 1,480,575 rest breaks during the period of time covered by his analysis but makes no statement as to how many of these break periods were missed or otherwise compromised. There is similarly no information in the report relating to off-the-clock work or reimbursement for steel-toed boots.

The Court will decide Plaintiff's motion in light of the foregoing facts and, where applicable, evidence set forth by Defendants.[6] See In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 313 (3d Cir. 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.")

## LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-701 (1979)) (internal quotation marks omitted). In a class action, one or more class members may "litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation." 1 Newberg on Class Actions § 1:1 (5th ed.) (citing Supreme Tribe of Ben Hur v.

---

[6] Plaintiff objects to certain statements in declarations Defendants filed in opposition to Plaintiff's motion. Doc. No. 51-1. Plaintiff's objections to statements with respect to skipping second meal breaks (paragraph 12 of the Declaration of Edward Avila, paragraph 10 of the Declaration of Nicole Berek, paragraph 20 of the Declaration of Maria Cabrera, paragraph 5 of the Declaration of Paul Fleming, and paragraph 21 of the Declaration of Hector Fregoso (Doc. No. 49-4)) are OVERRULED on the grounds that a declarant's own statements regarding his or her personal reasons for skipping second meal breaks do not constitute opinions or legal conclusions and, in any event, the Court is not limited to admissible evidence in deciding this motion. See Sali, 909 F.3d at 1005-06. The rest of Plaintiff's objections are OVERRULED as moot since the Court had no occasion to consider the statements at issue in deciding this motion.

Plaintiff's request that the Court take judicial notice of the Order on Motion for Summary Adjudication in Duran v. Vicar Operating, Inc., Case No. BC510327 (L.A. Sup. Ct.) (Doc. No. 46-4) is GRANTED pursuant to Federal Rule of Evidence 201.

1  Cauble, 255 U.S. 356, 363 (1921)).

2        Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which sets

3  forth a two-part framework for deciding whether a class may be certified for representative

4  litigation. See Kanawi v. Bechtel Corp., 254 F.R.D. 102, 107 (N.D. Cal. 2008).

5        First, Rule 23(a) asks whether a proposed class action satisfies each of the following four

6  requirements: (1) the class is so numerous that joinder of all members is impracticable; (2) there

7  are questions of law or fact common to the class; (3) the claims or defenses of the representative

8  parties are typical of the claims or defenses of the class; and (4) the representative parties will

9  fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

10        Assuming all four of the Rule 23(a) requirements are satisfied, the second step addresses

11  whether the proposed class satisfies the requirements of Rule 23(b)(1), Rule 23(b)(2), or Rule

12  23(b)(3). See Kanawi, 254 F.R.D. at 107. Here, Plaintiff seeks certification under Rule 23(b)(3),

13  which requires that "the questions of law or fact common to class members predominate over any

14  questions affecting only individual members, and that a class action is superior to other available

15  methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

16        A court must conduct a "rigorous analysis" to determine whether all applicable

17  requirements of Rule 23(a) and Rule 23(b) have been satisfied. General Telephone Co. of

18  Southwest v. Falcon, 457 U.S. 147, 161 (1982). The merits of the class members' substantive

19  claims are generally irrelevant to this analysis, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–

20  78 (1974), but courts are "at liberty to consider evidence which goes to the requirements of Rule

21  23 even though the evidence may also relate to the underlying merits of the case." Hanon v.

22  Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992) (citation and internal quotation marks

23  omitted). A court takes "the substantive allegations of the complaint as true," Blackie v. Barrack,

24  524 F.2d 891, 901 n.17 (9th Cir. 1975), and a court is not limited to considering only admissible

25  evidence in deciding a motion for class certification. Sali v. Corona Reg'l Med. Ctr., 909 F.3d

26  996, 1005-06 (9th Cir. 2018), cert. dismissed, 139 S. Ct. 1651 (2019).

27        Courts apply a preponderance of the evidence standard in deciding motions for class

28  certification, Martin v. Sysco Corporation, 325 F.R.D. 343, 354 (E.D. Cal. 2018), and the

1  proponent of class treatment bears the burden of affirmatively demonstrating that class

2  certification is warranted. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); see also,

3  Kanawi, 254 F.R.D. at 107 ("The party seeking certification must provide facts sufficient to

4  satisfy the requirements of Rule 23(a) and (b)." (citing Doninger v. Pac. Northwest Bell, Inc., 564

5  F.2d 1304, 1308–09 (9th Cir.1977)).

6      If a court decides to certify a class, the court must issue a certification order defining "the

7  class and the class claims, issues, or defenses, and must appoint class counsel" under Rule 23(g) of

8  the Federal Rules of Civil Procedure. Fed.R.Civ.P. 23(c)(1)(A)-(B).

9  **DISCUSSION**

10     Plaintiff seeks to represent an overarching class and several subclasses involving

11  approximately 1,195 non-exempt, hourly employees who worked in QG Printing's California

12  facilities "at any time from May 29, 2014 through the date of class certification" in connection

13  with claims relating to meal breaks, rest breaks, off-the-clock work and reimbursement of business

14  expenses. Plaintiff essentially contends that certification is warranted across the board because the

15  claims at issue are "predicated on Defendants' statewide, uniform policies and practices," Doc.

16  No. 46-1, page 6 of 30, while Defendants essentially contend that certification is unwarranted

17  because Plaintiff has failed to set forth "credible evidence" showing a "class-wide, unlawful

18  practice" in any area relevant to this motion. Doc. No. 49, page 9 of 43.

19     Neither party provided briefing of consequence as to certification of the overarching class,

20  so the Court will focus primarily on the proposed subclasses (and corresponding claims) in

21  conducting the required Rule 23(a) and Rule 23(b)(3) analyses, with occasional references to the

22  proposed overarching class for context. See Dawson v. Hertz Transporting, Inc., 2018 WL

23  6112623, at *4–5 (C.D. Cal. Nov. 5, 2018) (similar approach).

24  **I.    Numerosity and Ascertainability**

25     Rule 23(a)(1) expressly requires a showing that "the class is so numerous that joinder of all

26  members is impracticable." Fed.R.Civ.P. 23(a)(1). Generally speaking, 40 or more individuals in a

27  proposed class is sufficient to satisfy the numerosity requirement. See, e.g., Ries v. Ariz.

28  Beverages USA LLC, 287 F.R.D. 523, 536 (N.D. Cal. 2012) ("While there is no fixed number that

satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." (citing Californians for Disability Rights, Inc. v. Cal. Dep't of Transp., 249 F.R.D. 334, 346 (N.D.Cal.2008)).

Further, Rule 23 implicitly requires that the proposed class be ascertainable, particularly where, as here, certification is sought under Rule 23(b)(3). See Marcus v. BMW of North America, LLC, 687 F.3d 583, 592-93 (3d Cir. 2012); Jones v. ConAgra Foods, Inc., 2014 WL 2702726, *8 (N.D. Cal. 2014). "A class is not ascertainable unless membership can be established by means of objective, verifiable criteria." ConAgra Foods, Inc., 2014 WL 2702726 at *8 (citing Xavier v. Philip Morris USA, Inc., 787 F. Supp. 2d 1075, 1088–90 (N.D. Cal. 2011)). Class treatment is not appropriate if "the court must determine the merits of an individual claim to determine who is a member of the class," Roth v. CHA Hollywood Med. Ctr., L.P., 2013 WL 5775129, at *4 (C.D. Cal. Oct. 25, 2013) (quoting Johns v. Bayer Corp., 280 F.R.D. 551, 555 (S.D. Cal. 2012) (internal quotation marks omitted), and the party moving for class certification bears the burden of showing a sufficiently ascertainable class. See Whitaker v. Bennett Law, PLLC, 2016 WL 4595520, at *1 (S.D. Cal. May 27, 2016) ("As an essential prerequisite to class certification, plaintiff must show by a preponderance of the evidence that the class is ascertainable." (quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3rd Cir. 2013) (internal quotation marks omitted)).

### A.    Parties' Arguments

Plaintiff contends that the overarching class is sufficiently numerous because it comprises more than 1,195 current and former QG Printing employees and that the subclasses are sufficiently numerous because there is significant overlap between the class and each subclass.  For example, it appears that 1,186 of 1,195 putative class members worked a shift in excess of six hours and would therefore fall within the First Meal Break Subclass. Further, Plaintiff contends that the proposed class and subclasses may be "readily ascertained" from Defendants records, which show, inter alia, shift lengths, meal breaks and job classifications.

Defendants do not dispute numerosity but contend that the subclasses are not ascertainable because they are improperly predicated on alleged violations (such that membership in a given

1   subclass is "based on a determination of liability" with respect to one or more claims), as opposed

2   to "objective" criteria along the lines of job titles, job duties and such. For example, Defendants

3   argue that the only way to define the Rest Break Subclass would be to determine—*a priori* and

4   based on rebuttable "individualized inquiry"—whether a given employee had at some point been

5   denied a rest break. In addition, Defendants argue that the ascertainability requirement is not

6   satisfied because no end dates for the proposed subclasses are specified.

7          **B.      Analysis**

8          In the Court's view, the issues Defendants raise in connection with ascertainability can be

9   more neatly addressed in connection with commonality under Rule 23(a)(2) and predominance

10  under Rule 23(b)(3). There is some ambiguity as to the criteria for the proposed subclasses

11  because Plaintiff characterizes the proposed subclasses in more than one way: The notice of

12  motion defines the proposed subclasses in terms of objective criteria such as shift length and

13  period of employment, while the opening memorandum in support of Plaintiff's motion primarily

14  talks about each subclass in terms of the corresponding claims. For example, whereas the notice of

15  motion describes the Rest Break Subclass as "[a]ll non-exempt, hourly paid employees who

16  worked for Defendants in California at any time from May 29, 2014 through the date of class

17  certification and who worked at least one shift of more than 3.5 hour," the opening memorandum

18  describes the Rest Break Subclass as comprising employees who were required "to continue

19  working on [] printing machines, regardless of breaks." Taking theories of liability into account

20  when assessing ascertainability is not necessarily improper, see Cortez v. Best Buy Stores, LP,

21  2012 WL 255345, at *4 (C.D. Cal. Jan. 25, 2012), but in this case, the Court will decide

22  ascertainability based on the objective criteria set forth in the notice of motion and wait to address

23  theories of liability in connection with the commonality and predominance analyses for each

24  proposed subclass.

25         Taking that approach, the Court sees no reason why the objective criteria set forth in the

26  notice of motion cannot be applied—with ease—to define the class and each proposed subclass in

27  a manner that enables proper notice and clearly defines who would be bound by final judgment in

28  this case.  See Whitaker v. Bennett Law, PLLC, 2016 WL 4595520, at *1 (S.D. Cal. May 27,

2016). Further, Defendants' argument that Plaintiff has failed to provide end dates is unavailing because the definitions proposed by Plaintiff do provide end dates: They state that the class period and subclass periods end with "the date of class certification." The Court construes that to mean the date on which this Order is issued and, for the sake of clarity, defines the period applicable to the class and each of the proposed subclasses as May 19, 2014 through the date of this Order ("Class Period"). See Gomez v. J. Jacobo Farm Labor Contractor, Inc., 334 F.R.D. 234, 250 (E.D. Cal. 2019), modified on reconsideration, 2020 WL 1911544 (E.D. Cal. Apr. 20, 2020) (Ishii, J.) (citing Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001) and Taylor v. Autozone, Inc., 2011 WL 2357652, at *1 (D. Ariz. June 14, 2011) (redefining unascertainable class period end date as date of conditional class certification order)).

Since there is no dispute as to numerosity (and it appears quite likely that each proposed subclass comprises scores if not hundreds of putative members), the Court finds that Rule 23 numerosity and ascertainability requirements are satisfied.

**II.    Commonality and Predominance**

Rule 23(a)(2) provides that a class action can be maintained only where "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). A common issue is one where "the same evidence will suffice for each member to make a prima facie showing," Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1048, 194 L. Ed. 2d 124 (2016) (citation omitted); see also, In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006) (a common issue is one that is "susceptible to generalized, class-wide proof"), whereas an individual issue is one where "members of a proposed class will need to present evidence that varies from member to member." Tyson Foods, Inc., 136 S. Ct. at 1045 (citation and internal quotation marks omitted).

A single common question of fact or law can suffice to satisfy Rule 23(a)(2), see Dukes, 564 U.S. at 359, but the party seeking class certification must show that determination of that question will resolve an issue "central to the validity" of the claims of all members of a putative class "in one stroke." Id. at 350, 359; see also, Wang v. Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013) (remanding for the district court to "determine whether the claims of the proposed class depend upon a common contention ... of such a nature that it is capable of

classwide resolution"). At bottom, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." Dukes, 564 U.S. at 350 (citation and internal quotation marks omitted, emphasis original).

The predominance prong of Rule 23(b)(3), for its part, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). This requirement is "far more demanding" than the commonality requirement in Rule 23(a)(2) and requires a showing that a proposed class is "sufficiently cohesive to warrant adjudication by representation." See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997). More specifically, the predominance analysis looks at whether class treatment "will help achieve judicial economy," further the goal of efficiency, and "diminish the need for individual inquiry." See Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935, 944, 947 (9th Cir. 2009).

Common issues likely will not predominate where: "a great deal of individualized proof" is needed to address most or all of the elements of a claim, Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004); "a number of individualized legal points" would need to be established after common questions were resolved, id.; or "the resolution of ... [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." Cooper v. Southern Co., 390 F.3d 695, 722 (11th Cir. 2004). Common questions may predominate, however, where "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on each claim," Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003) (citations omitted), or where "adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced." 2 Newberg on Class Actions § 4:50 (5th ed.) (citing Klay, 382 F.3d at 1255).

A finding of predominance will generally not be "defeat[ed]" merely because there is a need to make individualized damage determinations, see Just Film, Inc. v. Buono, 847 F.3d 1108, 1121 (9th Cir. 2017), and neither challenges to a plaintiff's legal theories nor doubts about a

plaintiff's ability to prove a claim at trial are relevant in determining whether common issues predominate. See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Industrial & Serv. Workers Int'l Union, AFL-CIO, CLC v. Conoco-Phillips Co., 593 F.3d 802, 809 (9th Cir. 2010).

The Rule 23(a)(2) commonality requirement "has similarities with and serves as the foundation to" the predominance prong of Rule 23(b)(3). See 1 Newberg on Class Actions § 3:27 (5th ed.) (explaining that Rule 23(b)(3)'s predominance requirement "obviously builds on" Rule 23(a)(2)'s commonality requirement). The Court will therefore apply the commonality and predominance analyses concurrently for each of Plaintiff's proposed subclasses and the corresponding claims. See Gomez, 334 F.R.D. at 251.

**A.    First Meal Break Subclass**

The proposed "First Meal Break Subclass" comprises all non-exempt, hourly employees in Defendants' California facilities who worked at least one shift of more than six hours during the Class Period and involves claims that QG Printing "chronically understaffs its printing facilities in California while imposing strict deadlines which impede and discourage subclass members from taking, timely uninterrupted and compliant first meal breaks in shifts over six hours." Plaintiff further contends that Defendants failed to compensate putative members of the First Meal Break Subclass with premium payments for missed first meal breaks as required under state law.

1.    Applicable Law

Section 512(a) of Labor Code provides in pertinent part:

> An employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.

Cal. Lab. Code § 512, subd. (a); see also, 8 Cal. Code Regs. § 11010, subd. 11(A).

Further, Section 226.7, subdivision (c), of the Labor Code provides that the employer "shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal ... period is not provided." Cal. Lab. Code § 226.7, subd. (c); see also, 8 Cal. Code Regs. § 11010, subd. 11(D).

Generally, the employer's duty to provide a meal break is discharged "if it relieves its

1 employees of all duty, relinquishes control over their activities and permits them a reasonable

2 opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them

3 from doing so. Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012).

4         2.   Parties' Arguments

5      Plaintiff contends that claims relating to the First Meal Break Subclass present multiple

6 "clear and distinct common questions of law and fact," including: "a) did Defendants fail to

7 schedule meal breaks on a daily basis; b) was it Defendants' practice to prohibit employees from

8 leaving their machines unless there was proper coverage; c) did Defendants regularly impose

9 heavy workloads and insufficient staffing such that, combined with these policies and practices,

10 employees were often not provided compliant meal breaks; and d) did Defendants fail to

11 automatically pay break premiums when employees were not provided compliant breaks and,

12 instead, only pay them if and when employees submitted Missed Time Entry/Break ('MTE')

13 forms."

14      Defendants argue, in essence, that Plaintiff's claims with respect to the First Meal Break

15 Subclass are not predicated on a company policy against first meal breaks and that the record in

16 this case contradicts Plaintiff's assertion that Defendants had a uniform practice of discouraging or

17 impeding meal breaks in their California facilities. Thus, according to Defendants, individualized

18 inquiries into the unique circumstances of different subclass members—including, for example,

19 their employment location, the nature of their work, the identity and conduct of their supervisors,

20 work conditions and such—would be required to ascertain why putative members of this proposed

21 subclass were deprived of proper first meal breaks.

22         3.   Analysis

23      According to Plaintiff's expert, 1,186 members of the 1,195 or so putative members of the

24 proposed overarching class worked 535,304 shifts that were longer than six hours in the period

25 from May 29, 2014 to July 14, 2019. Of those 535,304 shifts, 21,724 did not exhibit a first meal

26 period; 46,464 exhibited a first meal period that was shorter than 30 minutes in length; and

27 111,258 exhibited a first meal period that "commenced after the end of the fifth hour of work (i.e.,

28 the first segment of work lasted longer than 5 hours before the first clock-out punch)." Doc. No.

46-2, Ex. A. Based on these data, it appears that 96% of the shifts in excess of six hours had a first meal break of some sort, but that 9% of first meal breaks in shifts in excess of six hours were shorter than 30 minutes in length and that 22% of first meal breaks in shifts in excess of six hours commenced after the end of the fifth hour of work. Further, it appears that somewhere between 16% and 34% of shifts in excess of six hours involved a first meal break violation of some sort (or conversely that between 66% and 84% of shifts over six hours did not involve a first meal break violation), depending on the degree of overlap between the short first meal break category (46,465 shifts) and late first meal break category (111,258 shifts) (which, for whatever reason, is not addressed in the expert report).[7]

　　　　With respect to declarations, the one declarant from the Jurupa Valley facility was deprived of a proper first meal break twice in six months as a QG Printing employee. Of the three West Sacramento Declarants, one makes no statement regarding missed first meal breaks at all; one was denied a proper first meal break once per month; and one was denied a proper first meal break three times per week. There is no declaration whatsoever from the Box Springs facility, and it appears that the 12 Merced Declarants were deprived of proper meal breaks at rates ranging from once a month, on the low end, to five or six times per week (essentially every day) on the high end.

---

[7] The Court also notes that the report describes the late first meal break category (comprising 111,258 shifts) as shifts including first meal breaks that "commenced after the end of the fifth hour of work (i.e., the first segment of work lasted longer than 5 hours before the first clock-out punch)." Doc. No. 46-2, Ex. A. California law, however, provides that "the period before a first meal is limited to five hours," Brinker, 53 Cal. 4th at 1048 (citing § 512, subd. (a)), so the mere fact that a meal break "commenced after the end of the fifth hour of work," as contemplated by the first part of the label applied by Plaintiff's expert, does not evidence wrongful conduct on Defendants' part. Wrongful conduct would only be implicated where "the first segment of work" in a given shift actually "lasted longer than 5 hours before the first clock-out punch," as contemplated by the second part of the label applied by Plaintiff's expert. The ambiguity in the label is all the more noteworthy, in the Court's view, because Plaintiff's briefing and deposition testimony evince an understanding that the first meal break must be provided *before* the end of the fifth hour of work, see, e.g., Doc. No. 46-1, page 8 of 30, line 27; Doc. No. 46-2, page 83 of 272, and the first paragraph of the expert report states only that the expert identified meal periods "occurring after the end of the fifth or tenth hours of work," with no indication that data collection or analysis was limited to shifts where more than five hours (or more than ten hours)—as opposed to precisely five hours (or ten hours)—passed prior to commencement of a meal break. Further, this ambiguity compounds the uncertainty arising from the fact that the expert provides no information on the extent to which the short first meal break category (46,464 shifts) and the late first meal break category (111,258 shifts) overlap. Inasmuch as Plaintiff has the burden on this motion, the Court would be justified in disregarding the problematic late first meal break category entirely (in which case the expert report would show that less than 13% of shifts over six hours had a first meal break violation of some sort), but even giving Plaintiff the benefit of the doubt in connection with the foregoing issues, the Court finds the data in the report unconvincing as to first meal breaks.

1    Finally, Plaintiff testified at deposition that it was QG Printing's policy to "take a lunch

2    break" before the end of the fifth hour of work, and Defendants set forth evidence showing that the

3    proposed subclass comprises 38 job titles across QG Printing's four California facilities. Doc. No.

4    49-11 ¶ 5.

5    In short, Plaintiff himself admits that Defendants did not have a policy prohibiting first

6    meal breaks and the declarations submitted in support of Plaintiff's motion shows significant

7    variability in the rate of alleged first meal break violations across employees and locations. The

8    violation rate ranges from once a month to every day in Merced, and there is no showing of

9    consequence that employees were regularly deprived of proper first meal breaks in the West

10   Sacramento, Jurupa Valley or Box Springs locations. Moreover, the data set forth by Plaintiff's

11   expert shows that missed first meal breaks were a rarity in shifts over six hours and that a decisive

12   majority of shifts over six hours did not involve an alleged meal break violation of any kind.

13   It may be that Plaintiff could show that Defendants had a policy not to schedule first meal

14   breaks, and it similarly appears that there may be common questions as to the nature and legality

15   of Defendants' practices with respect to premium pay for missed breaks. The Court sees little on

16   the record, however, to evidence a uniform practice with respect to impeding or discouraging

17   proper first meal breaks across—or within—QG Printing's California facilities. It is more likely,

18   in the Court's view, that individualized inquiries into the unique circumstances of employees in

19   different roles at different facilities at different points in time during the multi-year period at issue

20   in this case will be required to determine why a given first meal break was missed (or otherwise

21   comprised) in ascertaining Defendants' liability on first meal break claims. Thus, even assuming

22   commonality is satisfied under Rule 23(a)(2) in connection with Defendants' premium pay policy

23   and policy of not scheduling rest breaks, the Court finds that Plaintiff has failed to satisfy the

24   preponderance prong of Rule 23(b)(3) as to claims for the First Meal Break Subclass.

25        **B.    Second Meal Break Subclass**

26        The proposed "Second Meal Break Subclass" comprises all non-exempt, hourly employees

27   in Defendants' California facilities who worked at least one shift of more than 12 hours during the

28   Class Period, in connection with claims that Defendants had a "a class-wide policy and practice of

1  failing to provide second meal breaks."

2         1.    Applicable Law

3      Section § 512, subdivision (a), of the Labor Code provides, in pertinent part:

4      An employer shall not employ an employee for a work period of more than 10
    hours per day without providing the employee with a second meal period of not
5      less than 30 minutes, except that if the total hours worked is no more than 12 hours,
    the second meal period may be waived by mutual consent of the employer and the
6      employee only if the first meal period was not waived.

7  Cal. Lab. Code § 512, subd. (a); <u>see also</u>, 8 Cal. Code Regs. § 11010, subd. 11(B).

8      As with meal periods due after five hours, employers failing to provide the meal period

9  due after 10 hours must pay "one additional hour of pay at the employee's regular rate of

10  compensation for each work day that the meal ... period is not provided." Cal. Lab. Code § 226.7,

11  subd. (c); 8 Cal. Code Regs. § 11010, subd. 11(D).

12         2.    Parties' Arguments

13      Plaintiff contends that certification of claims for the Second Meal Break Subclass is

14  warranted because Defendants had a universal policy and practice of not providing second meal

15  periods and, by law, second meal periods cannot be waived for shifts in excess of 12 hours.

16  Further, Plaintiff contends that Defendants had a uniform policy not to pay premiums for missed

17  second meal breaks unless employees submitted forms requesting such premiums.

18      Defendants argue that there was no class-wide policy or practice with respect to second

19  meal periods for shifts in excess of 12 hours because QG Printing does not schedule shifts over 12

20  hours, although an employee will occasionally work longer than the scheduled 12 hours or clock

21  out late.

22         3.    Analysis

23      The report prepared by Plaintiff's expert shows 10,263 shifts greater than 12 hours in

24  length, corresponding to 601 employees. Of these, 10,207 did not exhibit a second meal period, 2

25  exhibited a second meal period that was shorter than 30 minutes in length, and 39 exhibited a

26  second meal period that commenced after the end of the tenth of work. Further, Plaintiff's expert

27  states that 375,777 shifts were greater than 10 hours in length. Thus, 2.7% of shifts in excess of 10

28  hours—and a mere 1.8% of all 575,659 shifts in the data set—were in excess of 12 hours, and on

average, a putative member of the Second Meal Break Subclass worked just 17 shifts in excess of 12 hours during the five years or so covered by the expert report (about 3 shifts each per year).

All declarants who worked shifts in excess of 10 hours state that "management had no policy for scheduling second meal periods and had no practice of permitting [] employees to take a second 30-minute meal period" and that they were "not provided a second 30-minute meal period" on days that they worked over 10 hours. None of Plaintiff's declarants, however, state that they worked shifts in excess of 12 hours or that they were deprived of proper second meal breaks on shifts in excess of 12 hours.

It appears that Plaintiff only worked over 12 hours on one occasion—when he worked 12 hours and seven minutes on December 4, 2017[8]—and the Court sees no testimony from Plaintiff as to second meal breaks for shifts in excess of 12 hours.

Finally, Defendants set forth several declarations from employees stating that most employees prefer to skip a second meal period and go directly home on rare occasions when a shift turns out to be longer than 12 hours, rather than extend the shift further with a meal break. Doc. No. 49-4, Ex. B.

Given the rarity of shifts in excess of 12 hours (as evidenced by Plaintiff's expert report), the complete lack information in Plaintiff's declarations regarding shifts in excess of 12 hours, Plaintiff's own lack of meaningful experience with shifts in excess of 12 hours, and the

---

[8] Plaintiff states that he is typical of putative members of the Second Meal Break Subclass because "he was routinely deprived of second meal breaks whenever he worked more than 12 hours" and that QG000001 through QG000006 in Exhibit G to the Declaration of Melissa Grant ("Grant Declaration") (Doc. No. 46-2) "evidenc[es] shifts [he] worked over 12 hours in which he was not provided a second meal break." Doc. No. 46-1, page 16 of 30. The Court reviewed QG000001 through QG000006 and sees only one instance in which it appears Plaintiff worked a shift in excess of 12 hours: a shift on December 4, 2017 (Plaintiff's second to last day of active work with QG Printing) comprising a first installment of 3.2 hours and a second installment of 8.92 hours, for a total of 12.12 hours, or 12 hours 7 minutes. In addition to corroborating Defendants' assertion that QG Printing did not schedule shifts in excess of 12 hours, this would appear to render false statements that Plaintiff was "routinely deprived" of second meal breaks and that QG000001 through QG000006 show "shifts"—plural—in excess of 12 hours. The Court allows for the possibility that it has misread the work history set forth in QG000001 through QG000006. Counsel for Plaintiff is therefore ORDERED to file within 10 days of electronic service of this Order authenticated documents clearly showing all shifts Plaintiff worked in excess of 12 hours while in QG Printing's employ (and only shifts in excess of 12 hours), as well as any materials counsel for Plaintiff believes might help the Court in understanding the apparent discrepancy between the data in Exhibit G to the Grant Declaration and statements made to the Court as to the frequency with which Plaintiff worked shifts in excess of 12 hours.

declarations provided by Defendants with respect to voluntarily skipping second meal breaks at the end of long shifts, it appears unlikely that Defendants can show at trial that QG Printing had a class-wide policy or practice or prohibiting second meal periods for shifts in excess of 12 hours, and more likely than not that liability determinations in connection with second meal breaks for shifts in excess of 12 hours would focus primarily on whether a given employee was somehow prevented from taking a second meal break or whether that employee voluntarily skipped the second meal break to get home earlier after the end of a long shift. This is particularly true, in the Court's estimation, because Plaintiff makes no showing that any shifts ran significantly over 12 hours and the one and only shift he apparently worked in excess of 12 hours was just 12 hours and seven minutes.

While second meal break claims may raise a common question as to whether employees were entitled to automatic premium pay for second meal breaks missed involuntarily on shifts in excess of 12 hours, the Court finds that extensive individualized inquiries (focusing largely on whether employees skipped second meal breaks voluntarily in the final few minutes of a long shift) would likely be required to determine liability on second meal break claims. Consequently, even assuming the Rule 23(a)(2) commonality requirement is satisfied, Plaintiff has failed to satisfy the Rule 23(b)(3) predominance requirement for claims on behalf of the Second Meal Break Subclass.

### C.   Meal Break Waiver Subclass

The proposed "Meal Break Waiver Subclass" comprises all non-exempt, hourly employees in Defendants' California facilities who worked at least one shift between five and six hours in length or between 10 and 12 hours in length, in connection with claims that Defendants use invalid, blanket meal waivers to deprive employees of a first meal break between the fifth and sixth hour of work and to deprive employees of a second meal break between the tenth and twelfth hours of work.

#### 1.   Applicable Law

The meal periods provided for under Section 512, subdivision (a) of the Labor Code (and under Section 11, subdivisions (A) and (B), of Industrial Welfare Commission ("IWC") Wage

1  Order 1-2001) may only be waived by mutual consent of both the employer and employee. <u>See</u>

2  <u>Brinker</u>, 53 Cal.4th at 1039. The first meal break, moreover, can only be waived for shifts "no

3  more than six hours," and the second meal break can only be waived for shifts of "no more than 12

4  hours" where the first meal break was not waived. Cal. Labor Code § 512, subd. (a); 8 Cal. Code

5  Regs. § 11010, subd. 11(A)- (B). And, again, employers failing to provide required meal breaks

6  must provide premium pay. Cal. Lab. Code § 226.7, subd. (c); 8 Cal. Code Regs. § 11010, subd.

7  11(D).

8          2.    <u>Parties' Arguments</u>

9        It is undisputed that numerous putative members of the Meal Break Waiver Subclass

10  executed meal break waivers for shifts between five and six hours in length and for shifts between

11  10 and 12 hours in length as part of the new hire process and prior to commencing work with QG

12  Printing. <u>See</u> Doc. No. 49, Part II.C.2.  Plaintiff contends that the prospective nature of these

13  waivers makes them ineffective and that employees who were denied a proper first meal break or a

14  proper second meal break based on such waivers are entitled to automatic premium pay.

15  Defendants do not dispute the use of waivers with respect to meal breaks but contend that the

16  waivers were valid.

17          3.    <u>Analysis</u>

18        Data set forth by Plaintiff's expert show that there was no first meal break on 85% of shifts

19  greater than five but less than six hours in length and no second meal break on 99.5% of shifts

20  greater than 10 hours but less than 12 hours in length. Moreover, there is no dispute that

21  prospective waivers executed at the commencement of employment were used extensively in

22  connection with first meal breaks on shifts of six hours or less and second meal breaks on shifts of

23  12 hours or less. Given these facts, it appears that determinations as to the validity of QG

24  Printing's prospective waivers and QG Printing's failure to provide premium pay automatically

25  will drive resolution of most—if not all—claims for the Meal Break Waiver Subclass and that any

26  individualized inquiries would pertain primarily to damages (based on the number of meal breaks

27  missed based on invalid waivers and the amount of premium payment improperly withheld). The

28  Court therefore finds that both commonality and preponderance are satisfied as to claims on behalf

of the Meal Break Waiver Subclass. See Brinker, 53 Cal. 4th at 1033 ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment.")

### D.   Rest Break Subclass

The proposed "Rest Break Subclass" comprises all non-exempt, hourly employees in Defendants' California facilities who worked at least one shift of more than 3.5 hours during the Class Period, in connection with claims that subclass members were unlawfully deprived of rest breaks due to "Defendants' practices and procedures requiring employees to remain on premises for rest breaks and chronic understaffing."

#### 1.   Applicable Law

Section 226.7, subdivision (b), of the Labor Code provides that "[n]o employer shall require an employee to work during any meal or rest or recovery period mandated pursuant to an … applicable order of the Industrial Welfare Commission …." Cal. Labor Code § 226.7, subd. (b).

California IWC Wage Order No. 1-2001, subdivision 12(A), provides:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.

8 Cal. Code Regs. § 11010, subd. 12(A).

Further, the California Supreme Court held in *Brinker* that "[e]mployees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." Brinker, 53 Cal. 4th at 1029. Employers are required to "authorize and permit" rest breaks, but rest breaks can be waived. Id. at 1033.

Where an employer fails to provide an employee with required rest periods, the employer must pay the employee an additional hour of compensation at the employee's regular rate of pay for each work day that a required rest period is not provided. Cal. Lab. Code§ 226.7, subd. (c); 8 Cal. Regs. Code § 11010, subd. 12(B).

1          2.    Parties' Arguments

2          Plaintiff contends that the rest break claims involve common questions as to whether

3    Defendants prevented employees from taking compliant rest periods "as a matter of uniform

4    practice" by failing to schedule rest breaks and imposing heavy workloads with insufficient

5    staffing and as to whether Defendants imposed a policy prohibiting employees from leaving the

6    premises during breaks.

7          Defendants argue that QG Printing had a "compliant written rest break policy" and that the

8    question of whether a given employee missed a rest break due to coercion or understaffing

9    requires an individualized inquiry in which "[t]he Court would need to inquire of every individual

10   class member whether he or she in fact took a rest break or did not, and if not, why not."

11         3.    Analysis

12         Plaintiff's expert states that putative members of the Rest Break Subclass were collectively

13   entitled to nearly 1,480,575 breaks during the period of approximately five years that he reviewed

14   but provides no analysis as to how many breaks were missed because such information was not

15   available at the time he prepared his report and requires a survey of putative class members.

16         The one Jurupa Valley Declarant was deprived of five proper rest breaks each week. Of the

17   three West Sacramento Declarants, one was deprived of proper rest breaks less than once a week;

18   one was deprived of proper rest breaks twice a week; and one was deprived of proper rest breaks

19   five times per week. As to the Merced Declarants, one was deprived of proper rest breaks less than

20   once a week; one was deprived of proper rest breaks once or twice a week; one was deprived of

21   rest breaks twice per week; one never received a third rest break when working 10 or more hours;

22   and one "regularly" had to forego his rest breaks. The other Merced Declarants were deprived of

23   proper rest breaks at least three or four—and as many as eight to twelve times— per week. There

24   are no declarations from Box Springs, but substantially all declarants who were deprived of breaks

25   at the other three California facilities essentially state that the deprivations occurred because QG

26   Printing had a policy of failing to schedule rest breaks, assigned a demanding workload and

27   deployed insufficient staff.

28         Nine of the Merced Declarants state that QG Printing required employees to remain on-site

26

1   during breaks to physically observe ongoing projects, and Plaintiff has set forth what appears to be

2   an orientation presentation for the Merced facility stating that employees were only permitted to

3   leave the premises during meal breaks. Doc. No. 46-2, Ex. Q. Only one of the three West

4   Sacramento Declarants, however, states that employees were required to remain on the premises

5   during breaks, and Plaintiff provides no evidence of such a policy or practice in Jurupa Valley or

6   Box Springs.

7        Finally, Plaintiff himself testified in deposition that he skipped rest breaks "a lot" but that

8   no supervisor instructed or encouraged him not to take a break.

9        While the declarations appear to show that breaks were missed with some frequency at QG

10   Printing, the number of declarations is too small to convincingly corroborate Plaintiff's contention

11   that QG Printing had a class-wide practice of discouraging breaks by understaffing heavy

12   workloads, particularly given the apparent variability in the rates at which declarants missed

13   breaks and Plaintiff's own testimony that he was never discouraged from taking a break. There

14   may be cases where missed breaks are so prevalent—and where the rate of missed breaks is so

15   uniform—that the missed breaks themselves evidence a class-wide practice of some sort but, in

16   the Court's view, Plaintiff has failed to meet that threshold here.

17        Similarly, there is some evidence (9 declarations and an orientation presentation) that QG

18   Printing prohibited employees in Merced from leaving the facility on rest breaks, but there is a

19   lack of such evidence as to the other three facilities (which presumably account for a substantial

20   portion of the proposed subclass). Moreover, even if a determination were made that QG Printing

21   had a class-wide policy prohibiting employees from leaving facilities at rest breaks (and that such

22   a policy was unlawful), trial would still involve not only the individualized work of determining

23   (presumably through questionnaires or some similarly targeted means) the extent to which this

24   policy harmed individual employees, but also the individualized work required to decide claims

25   involving breaks that were compromised for reasons unrelated to QG Printing's alleged "on-

26   premises" policy.

27        At bottom, it appears more likely than not that establishing liability as to a given class

28   member in connection with missed breaks would require ascertaining through individualized

inquiry the extent to which each putative class member missed break time and then examining the

circumstances surrounding each missed break, including, for example, workload at the time and

what interactions, if any, took place with the employee's supervisor as to the break in question.

Litigating such claims on a class basis could offer some efficiencies (for example, legal

determinations on the question of requiring employees to stay on site during breaks and the

question of whether premium pay must be automatic could potentially apply to a large number of

class members), but ultimately hundreds and perhaps thousands of employee-specific—and break-

specific—determinations could be required. The Court therefore finds that, although commonality

may be satisfied, the Rule 23(b)(3) predominance requirement is not satisfied as to claims for the

Missed Rest Break Subclass.

**E.      Off-the-Clock Work Subclass**

The proposed "Off-the-Clock Work Subclass" comprises all non-exempt, hourly

employees in Defendants' California facilities during the Class Period, in connection with claims

that Defendants maintained a class-wide policy and practice of requiring employees to determine

their assigned workstation by watching a scrolling monitor prior to clocking in for a shift.

1.      Applicable Law

California law requires an employer to pay for all "hours worked" by an employee. See

Morillion v. Royal Packing Co., 22 Cal. 4th 575, 582 (2000). "Hours worked" means "the time

during which an employee is subject to the control of an employer, and includes all the time the

employee is suffered or permitted to work, whether or not required to do so." 8 Cal. Code Regs., §

11010, subd. 2(G). "[T]hat employees are clocked out creates a presumption they are doing no

work," and liability on an off-the-clock-work claim is, thus, "contingent on proof [that an

employer] knew or should have known off-the-clock work was occurring. Brinker, 53 Cal. 4th at

1051-52.

2.      Parties' Arguments

Plaintiff contends that Defendants implemented a uniform policy requiring employees to

report to an assignment board, obtain their assignment, and then go to the clock-in station nearest

their assignment before clocking in. According to Plaintiff, the existence and legality of this policy

are predominant questions of fact and law that can be resolved by common proof. Defendants argue that this subclass cannot be certified because Plaintiff has not met his burden to show that such a policy exists.

            3.    <u>Analysis</u>

The Jurupa Valley Declarant states he that he worked off the clock prior to his shift approximately once a month because "[m]anagement required that [he] know [his] printer assignment before going down to the floor" and that "he would often begin working before [his] scheduled start time so that [he] could take an online safety training course."

Of the three West Sacramento Declarants, one worked off-the-clock for 30 minutes once or twice per month, checking assignments and communicating "with supervisors and other employees to discuss ongoing issues"; one cleaned up his work area after clocking out approximately three times a week; and one made no statement regarding off-the-clock work.

Of the 12 Merced Declarants, three worked off the clock on a regular basis because management required them to check monitors for their assignments before commencing work; one states he worked off-the-clock five times per week because he was not compensated for the time it took to put on his uniform prior to work; and seven make no statement indicating that they worked off the clock prior to the commencement of a shift.

One QG Printing employee testified at deposition that employees receive assignments from a scrolling list on two or more monitors located near the entrance to each facility but did not know how long it took to scroll through the complete list.

Plaintiff, for his part, testified that it takes "longer" than a couple of seconds to check the assignment board, but also testified that he was allowed to clock in ahead of his shift to have time to look at the assignment board (although he could not recall how much time he was given to do so).

The Court agrees with Defendants that Plaintiff has failed to make a showing that Defendants had a policy or practice of requiring employees to work off-the-clock by scrolling through assignment monitors before clocking in for a shift. Only 25% of Plaintiff's declarants state that they checked monitors prior to clocking in; there is no declaration at all as to checking

monitors from the Box Springs facility; and Plaintiff himself concedes that he was permitted to clock in prior to the commencement of his shift to have time to check the assignment board. On these facts, it appears to the Court that the question of whether QG Printing had a policy or practice of requiring employees to check an assignment board prior to clocking-in would be of limited significance at trial and that adjudication of off-the-clock work claims would focus largely on individualized inquiries regarding the extent to which a given employee was improperly required or suffered to engage in other conduct—such as taking safety courses, communicating with co-workers, engaging in cleaning before or after shifts, or working through meal breaks. Thus, the Court finds that neither the commonality requirement under Rule 23(a)(2) nor the preponderance requirement under Rule 23(b)(3) has been satisfied with respect to claims for the proposed Off-the-Clock Work Subclass.

### F.   Business Expense Subclass

The proposed Business Expense Subclass comprises all non-exempt, hourly employees in Defendants' California facilities during the Class Period who purchased steel-toed boots for use at work in accordance with Defendants' policies, in connection with claims that QG Printing did not provide legally sufficient reimbursement for such purchases.

#### 1.   Applicable Law

Section 2802, subdivision (a), of the Labor Code provides "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties or of his or her obedience to the directions of the employer …." Cal. Labor Code § 2802, subd. (a). Section 2802 "is designed to prevent employers from passing their operating expenses on to their employees," Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 562 (2007), and an employer that "knows or has reason to know that the employees have incurred reimbursable expenses" owes a "duty to exercise due diligence and take any and all reasonable steps to ensure" that the employees are reimbursed. Stuart v. RadioShack, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009).

#### 2.   Parties' Arguments

Plaintiff contends that Defendants maintained a policy requiring employees to wear steel-

1  toed boots on the production floor for safety reasons. Defendants provided reimbursement of up to

2  $50 per year for the purchase of steel-toed safety boots, but according to Plaintiff, the amount was

3  insufficient. For example, Plaintiff set forth evidence showing that a mobile shoe retailer that

4  Defendants engaged to make steel-toed boots available for purchase on site did not sell steel-toed

5  boots for less than $50 and that a witness for Defendants paid more than $50 for her steel-toed

6  boots.

7        Defendants contend that it had no legal obligation to provide reimbursement for steel-toed

8  boots because steel-toed boots are generally usable in factory work for other employers and that,

9  in any event, steel-toed boots sufficient to satisfy Defendants' safety requirements were available

10 from Amazon and Walmart for less than $50. According to Defendants, some employees spent

11 more than $50 on steel-toed boots out of personal preference. Moreover, Defendants contend

12 variation in the amount employees spent on steel-toed boots precludes class certification because

13 "to determine liability, it would be necessary to engage in individualized inquiries as to whether it

14 was reasonably necessary to purchase shoes above the Company-provided budget."

15        3.   Analysis

16        The Court agrees with Plaintiff. Determinations on the questions of whether steel-toed

17 shoes were a reimbursable expense and whether the $50 allowance was sufficient would have

18 significant class-wide implications. For example, a finding that Defendants were not obligated to

19 provide reimbursement for steel-toed shoes could extinguish the claims as to all putative class

20 members completely,[9] as could a finding that adequate steel-toed shoes were available to putative

21 class members for $50 or less. Conversely, in the event of a finding that Defendants were

22 obligated to provide reimbursement for steel-toed boots coupled with a finding that suitable boots

23

24 ───────────────

25 [9] It would be improper to pass on the legality of Defendants' alleged policy with respect to reimbursement for steel-toed shoes on this motion and the Court declines to do so. See Stockwell v. City & County of San Francisco, 749 F.3d 1107, 1113-14 (9th Cir. 2014) ("[T]he district court erred in denying class certification because of its legal error of

26 evaluating merits questions, rather than focusing on whether the questions presented, whether meritorious or not, were common to the members of the putative class."); see also, Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568

27 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

28

1    were not available for $50 or less, individualized liability determinations would be greatly

2    minimized and damages could potentially be determined based largely on expert analysis of

3    transaction records.

4          Thus, it appears that questions as to Defendants' legal obligations and the pricing of steel-

5    toed boots could be determined in more or less one stroke and that such determinations would

6    drive the resolution of most class member claims, easily predominating over any individualized

7    questions that may arise. Thus, the Court finds that the commonality requirement under Rule

8    23(a)(2) and the predominance requirement under Rule 23(b)(3) are satisfied as to claims for the

9    Business Expense Subclass.

10         **G.    Derivative Claims Subclass**

11         Plaintiff seeks omnibus certification—through the rubric of a "Derivative Claims

12   Subclass"—of claims under Sections 510, 1198, 1194, 1197, 1197.1, 201, 202, 203, 204, and 226

13   of the Labor Code and under Section 17200, et seq., of the Business & Professions Code.

14         Plaintiff asserts, without elaboration, that these claims are "entirely or partially derivative"

15   of the claims alleged as to each of the foregoing subclasses and "should therefore be certified

16   along with them." Defendants, for their part, contend that certification of these claims is

17   unwarranted because the core claims as to each subclass are themselves unsuitable for class

18   treatment.

19         The Court finds it hard to believe that Plaintiff would expect the Court to find, in one fell

20   swoop, that 11 separate claims are suitable for certification based solely on the conclusory and

21   categorical assertion that they are "entirely or partially derivative" of core claims and without the

22   benefit of any substantive briefing (or, at a minimum, some useful explanation as to how Plaintiff

23   believes his "derivative" claims intersect with his core claims).

24         In any event, it is Plaintiff's burden to affirmatively satisfy the Rule 23(a)(2) commonality

25   requirement and the Rule 23(b)(3) predominance requirement as to claims for which he seeks class

26   certification. See Dukes, 564 U.S. 338, 350 (2011); see also, Longest v. Green Tree Servicing

27   LLC, 308 F.R.D. 310, 321 (C.D. Cal. 2015) ("More than a pleading standard, Rule 23 requires the

28   party seeking class certification to affirmatively demonstrate compliance with the rule[.]")

(citations omitted). Plaintiff has made no meaningful attempt to do so here, and thus the Court cannot find that certification of the claims in the Derivative Claims Subclass is warranted. See Gomez, 334 F.R.D. at 266.

**III.   Typicality**

Under Rule 23(a)(3), class certification is proper only where "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon, 976 F.2d at 508 (citation omitted). Similarly, "typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class so that the court may properly attribute a collective nature to the challenged conduct." 1 Newberg on Class Actions § 3:29 (5th ed.) (citations omitted).

The Ninth Circuit's test of typicality is (1) "whether other members have the same or similar injury," (2) "whether the action is based on conduct which is not unique to the named plaintiffs," and (3) "whether other class members have been injured by the same course of conduct." Wolin v. Jaguar Land Rover North America, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation and internal quotation marks omitted). The representative plaintiff's claims need not be identical to those of the class, but rather need only be "reasonably co-extensive with those of absent class members," Hanlon, 150 F.3d at 1020, such that the claims of the putative class are "fairly encompassed by the named plaintiff's claims." Falcon, 457 U.S. at 156 (internal quotation marks omitted).

Plaintiff argues that typicality is satisfied because Plaintiff is a member of the proposed class and has directly suffered the harms alleged as to each of the proposed subclasses, while Defendants argue that typicality is not satisfied because the roles and responsibilities of the "38 different jobs" covered by the proposed class and subclasses varied significantly. For, example, Defendants state that forklift divers "would not report to a workstation [], need to check the assignment board," or miss breaks due to printer malfunctions.

As set forth above, the Court finds that only claims for the Meal Break Waiver Subclass

and the Business Expense Subclass satisfy the commonality and preponderance requirements for certification. Plaintiff has set forth evidence showing that he executed a prospective meal break waiver at the commencement of this employment with QG Printing, Doc. No. 46-2, Ex. H, as well as evidence showing that he missed meal breaks putatively covered by the waiver. Doc. No. 46-1, Part IV.D. Similarly, he sets forth evidence showing that he paid more than $50 for steel-toed boots for work at QG Printing. Id. As such, it appears Plaintiff suffered the "same or similar injury" as other members of each of the subclasses in question due to uniform policies that had essentially the same effect on all subclass members. See Wolin, 617 F.3d at 1175. The Court therefore finds that typicality is satisfied as to the Meal Break Waiver Subclass and the Business Expense Subclass.

**IV.    Adequacy**

Pursuant to Rule 23(a)(4), a class action can be maintained only where the "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The term "parties" refers to both the class representative and the class counsel. See Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006); In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Marketing Litigation, 270 F.R.D. 521, 531 (N.D. Cal. 2010). Therefore, "the standard for adequacy splits into two prongs: adequacy of the proposed class representative and adequacy of the attorneys seeking appointment as class counsel." 1 Newberg on Class Actions § 3:54 (5th ed.).

**A.    Adequacy of Class Representative**

The adequacy of the class representative focuses on "whether there are conflicts of interest between the proposed representative and the class, and whether the proposed representative is qualified to serve as a class representative ...." 1 Newberg on Class Actions § 3:54 (5th ed.).

Defendants argue that Plaintiff is not an adequate class representative because he has an "irreconcilable conflict" with non-exempt, hourly-paid supervisors who allegedly pressured him to forgo rest and meal breaks. Further, Defendants argue that the scope and duration of Plaintiff's employment was too limited for him to provide adequate representation for hundreds of employees who worked in nearly 40 positions at four different facilities over a span of several

34

1 years.

2    These arguments are essentially irrelevant in light of the Court's finding that only claims

3 for the Meal Break Waiver Subclass and the Business Expense Subclass satisfy the commonality

4 and predominance requirements for certification. QG Printing's waivers and steel-toed boots

5 policy appear to have applied in the same way to all members of the corresponding subclasses and

6 the Court sees no reason why challenging either policy would give rise to a conflict between

7 Plaintiff and his former supervisors. Moreover, the record shows that Plaintiff suffered the same

8 alleged injury as his former colleagues in connection with QG Printing's waivers and

9 reimbursement policy (inasmuch as he supposedly waived meal breaks paid $200 for work boots

10 and) and that he has actively participated in developing this case. See East Texas Motor Freight

11 Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (adequacy requires that the "class representative

12 must be part of the class and 'possess the same interest and suffer the same injury' as the class

13 members"). The Court therefore finds that Plaintiff is an adequate representative of the Meal

14 Break Waiver Subclass and of the Business Expense Subclass.

15        **B.    Adequacy of Class Counsel**

16    The adequacy of class counsel focuses on "whether the attorneys who seek to represent the

17 class are competent to do the job." 1 Newberg on Class Actions § 3:54 (5th ed.). To determine the

18 adequacy of the class counsel, Rule 23(g) requires a court to consider the following four factors:

19 "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii)

20 counsel's experience in handling class actions, other complex litigation, and the types of claims

21 asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that

22 counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(A)(i)-(iv).

23    As detailed in the Grant Declaration, Plaintiff's counsel, Capstone Law APC ("Capstone

24 Law"), specializes in wage and hour litigation and has achieved class certification and final

25 approval of settlement in multiple class actions. Doc. No. 46-2. Further, Capstone Law attorneys

26 Melissa Grant, Bevin Allen Pike, Orlando Villalba and Joseph Hakakian have devoted significant

27 time and resources to this case, reviewing 77,000 pages of documents, conducting and defending

28 numerous depositions, identifying putative class members, and engaging an expert to analyze time

1    and pay records produced in this litigation to support the theories asserted in this motion. Id. The

2    Court therefore finds that Capstone Law satisfies the adequacy requirement as to class counsel.

3    **V.    <u>Superiority</u>**

4          The superiority requirement of Rule 23(b)(3) asks whether class aggregation is superior to

5    other available procedural alternatives, such as individual actions, coordinated individual actions,

6    test or model cases, and consolidated individual actions. <u>See</u> Advisory Committee Note to 1966

7    Amendments to Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966) (discussing alternative

8    procedures). Rule 23(b)(3) lists four illustrative, non-exhaustive factors to help guide courts in

9    determining whether the advantages of class aggregation are present: (1) the class members'

10   interests in individually controlling their own litigation; (2) the extent and nature of any already-

11   pending litigation concerning the controversy; (3) the desirability of concentrating claims in one

12   judicial forum; and (4) potential problems that could arise in managing the case as a class suit.

13   Fed. R. Civ. P. 23(b)(3).

14          Neither side has provided damages estimates, but even assuming some class members were

15   improperly deprived of meal breaks on every shift for the entire Class Period and purchased steel-

16   toed boots at high price points in each year of the Class Period, it is hard to see how the total

17   individual recovery on claims relating to meal break waivers and steel-toed boots could exceed

18   $50,000 (roughly double the amount of lost premium pay where an employee making $20 per

19   hour missed a meal break in every shift for the entire Class Period) or otherwise come close to

20   making individual litigation of Meal Break Waiver claims and Business Expense claims cost-

21   effective. Moreover, the Court does not see the advantage to any plaintiff of litigating the legality

22   of QG Printing's meal waivers and reimbursement policy individually, since such determinations

23   would necessarily turn on company records as opposed to facts specific to a given employee.

24          As to the other three elements of the superiority analysis, the Court is not aware of pending

25   litigation regarding the subject matter of this case; there is no good reason to spread litigation

26   involving two policies of a single company across multiple fora, particularly since this action

27   pertains solely to employees in California; and while performing damages calculations for

28   hundreds of class members always involves some complications, the Court does not foresee

1 │ special problems managing class litigation around QG Printing's waiver and reimbursement

2 │ policies. Thus, the Court finds that the superiority requirement is satisfied as to the Meal Break

3 │ Waiver Subclass and as to the Business Expense Subclass.

4 │ **CONCLUSION**

5 │       For the foregoing reasons, the Court finds that the Meal Break Waiver Subclass and the

6 │ Business Expense Subclass satisfy the requirements for class certification in Rule 23(a) and Rule

7 │ 23(b)(3) of the Federal Rules of Civil Procedure and that Plaintiff's other proposed subclasses are

8 │ not suitable for class treatment. Further, the Court finds that Plaintiff Paul Clark and Capstone

9 │ Law APC are adequate representatives of the two subclasses deemed suitable for certification.

10 │ **ORDER**

11 │       Accordingly, IT IS HEREBY ORDERED as follows:

12 │ 1. Plaintiff's certification motion (Doc. No. 46) is GRANTED, IN PART, and DENIED,

13 │     IN PART, as follows:

14 │     a. Plaintiff's claims in connection with the Meal Break Waiver Subclass, as

15 │        identified *supra*, is CERTIFIED for class aggregation under Rule 23(b)(3), with

16 │        the following class definition:

17 │        All individuals who were employed by QG Printing II, LLC in California as

18 │        non-exempt, hourly-paid employees at any time from May 29, 2014 through the

19 │        date of this Order and who worked at least one shift between five and six hours

20 │        in length or at least one shift between 10 and 12 hours in length.

21 │     b. Plaintiff's claims in connection with the Business Expense Subclass, as

22 │        identified *supra*, is CERTIFIED for class aggregation under Rule 23(b)(3), with

23 │        the following class definition:

24 │        All individuals who were employed by QG Printing II, LLC in California as

25 │        non-exempt, hourly-paid employees at any time from May 29, 2014 through the

26 │        date of this Order and who worked, at any point during that period, in a

27 │        capacity where the use of protective footwear was required under QG Printing

28 │        II, LLC and / or Quad/Graphics, Inc. policy.

     c.   Plaintiff's other claims are NOT CERTIFIED for class aggregation under Rule 23.

     d.   Paul Clark is APPOINTED as the class representative;

     e.   Capstone Law APC is APPOINTED as the class counsel.

2.   The parties must promptly MEET AND CONFER about the submission of a joint stipulated class notice and distribution plan. Within 21 days of this order, the parties must FILE either a stipulated class notice and distribution plan or a notice that no stipulation can be agreed to. If the parties cannot agree to a class notice or distribution plan, then Plaintiff must FILE a proposed class notice and distribution plan within thirty-five days of this order, and Defendants shall have fourteen days following Plaintiff's filing to file any objections, and Plaintiff shall have seven days following Defendants' filing to FILE a reply.

3.   Plaintiff shall FILE within 10 days of the date of electronic service of this Order documents sufficient to show clearly all (and only) shifts worked by Plaintiff in excess of 12 hours while in the employ of QG Printing II, LLC, as well as an explanation as to any discrepancy between the contents of such documents and statements made in briefing for this motion as to the frequency with which Plaintiff worked shifts in excess of 12 hours.

4.   This case is REFERRED BACK to the assigned magistrate judge for further scheduling and other proceedings consistent with this Order.

IT IS SO ORDERED.

Dated:  _September 17, 2020_                                 

                                 SENIOR  DISTRICT  JUDGE