**PIMENTEL LAW, P.C.**
Gabriel J. Pimentel, Esq. (SBN 265328)
GJP@PimentelLaw.com
30 N. Raymond Ave., Ste. 210
Pasadena, CA 91103
Tel: (626) 765-6505
Fax: (626) 628-3036

Attorney for Prospective Plaintiff-Intervenor,
ELITH CHRIS RAMOS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA—FRESNO DIVISION**

PAUL CLARK, individually, and on behalf of other members of the general public similarly situated and as aggrieved employees pursuant to the Private Attorneys General Act ("PAGA"),

Plaintiff, and

ELITH CHRIS RAMOS, individually, and on behalf of others similarly situated and as aggrieved employees pursuant to the PAGA,

Prospective-Plaintiff Intervenor,

vs.

QG PRINTING II, LLC, a Connecticut limited liability company; QUAD /GRAPHICS, INC., a Wisconsin corporation; and DOES 1 through 10, inclusive,

Defendants.

Case No.: 1:18-cv-00899-AWI-EPG

**PROSPECTIVE PLAINTIFF-INTERVENOR ELITH CHRIS RAMOS'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR LEAVE TO INTERVENE**

Date: November 2, 2020
Time: 1:30 p.m.
Judge: Anthony W. Ishii
Courtroom: 2

Trial Date: None

## I. INTRODUCTION

Defendants' Opposition begins with a demonstrably false representation that after Clark filed his action, Ramos filed a duplicate PAGA claim. This is complete fiction. Ramos's PAGA claim was filed on December 3, 2018, whereas Clark's was filed three months later on March 7, 2019. Thus, if any PAGA claim is "duplicative," it would be Clark's, not Ramos's.

Defendants' introduction claims that under mandatory intervention, Ramos cannot intervene because he has not established an independent basis for the Court's exercise of supplemental jurisdiction. However, he has established a basis to exercise diversity jurisdiction, as the Complaint demonstrates that the amount in controversy is well over $75,000 and that the parties are residents of different states.

The introduction next claims that Ramos has a fundamental misunderstanding of PAGA. This claim is based on a make-believe argument (that Ramos never made) that Defendants' counsel has imputed to Ramos's counsel. Indeed, the Opposition pretends as if Ramos made a "personal interest" standing argument, then proceeds to knock down that strawman argument. But Ramos's Motion never argued that he has standing to intervene based on some personal individual interest he has in this suit. Rather, he argued that his status as a state proxy, which confers on him the same legal rights as the state, gives him standing to intervene on its behalf. Thus, the only fundamental misunderstanding here is with defense counsel's miscomprehension of Ramos's standing argument.

The introduction then claims that Ramos's interests are adequately protected because the Court and the state will be there to protect them. But the fact that the Court must ultimately approve, and the Labor & Workforce Development Agency (LWDA) can (theoretically) object, to any potential settlement is no grounds to deny intervention when a third party has established a right to intervene. Otherwise, no party could ever intervene in a class action or PAGA suit.

The introduction lastly claims that Ramos's Motion is not timely because intervention is required as soon as one has reason to know their interests might be adversely affected by

the outcome of the litigation and Ramos "has been aware of this litigation since at least February 2019 …." However, this misguided argument ignores well-settled appellate precedent holding that the date the proposed intervenor learns of a lawsuit is not the starting point for determining the timeliness of intervention. *See Chamness v. Bowen*, 722 F.3d 1110, 1121 (9th Cir. 2013); *Legal Aid Soc. of Alameda Co. v. Dunlop*, 618 F.2d 48, 50 (9th Cir. 1980) ("the date on which the party seeking intervention became aware of the litigation is by itself not always relevant"). No attempt is made to articulate why there should be an exception to this rule in this case.

Based on the foregoing, Defendants have failed to offer any legitimate reasons for denying Ramos intervention.

## II. ARGUMENT

### a. Ramos Has Established an Independent Basis for the Court to Exercise Supplemental Jurisdiction Over His Claim for Intervention

Defendants claim that Ramos has not established that there is diversity jurisdiction under Section 1332 because he has not pled the requisite amount in controversy.

"In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint. *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D. Cal. 2002). The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will *actually* owe." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-05 (E.D. Cal. 2008) (internal citations and quotations omitted).

"The amount in controversy is determined by the complaint operative at the time of removal and encompasses all relief a court may grant on that complaint if the plaintiff is victorious." *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413 (9th Cir. 2018). "The amount in controversy may include damages (compensatory, punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees awarded under fee shifting statutes. In assessing the amount in controversy, we may consider allegations in the complaint and

in the notice of removal, as well as summary-judgment-type evidence relevant to the amount in controversy." *Id.* at 416. (internal quotations and citations omitted). Further, a court may also consider supplemental evidence regarding amount in controversy later proffered, which was not originally included in the removal notice. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 fn. 1 (9th Cir. 2002). "In cases where a plaintiff's state court complaint does not specify a particular amount of damages … the defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds that amount." *Sanchez v. Monumental Life Insurance Co.*, 95 F.3d 856, 862 (9th Cir. 1996).

"As the Supreme Court has explained, the fact that the complaint discloses the existence of a valid defense to the claim does not eliminate federal jurisdiction, nor do events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit. *St. Paul Mercury Indemnity Co.*, 303 U.S. at 289-90, 58 S.Ct. 586. This rule makes sense; just because a defendant might have a valid defense that will reduce recovery to below the jurisdictional amount does not mean the defendant will ultimately prevail on that defense. Further, if a district court had to evaluate every possible defense that could reduce recovery below the jurisdictional amount the district court would essentially have to decide the merits of the case before it could determine if it had subject matter jurisdiction." *Geographic Expeditions v. Est. of Lhotka*, 599 F.3d 1102, 1108 (9th Cir. 2010).

Here, Ramos's Complaint seeks damages for reimbursement of hand tools, unpaid wages, liquidated damages, statutory and civil penalties, prejudgment and post judgment interest, declaratory relief, injunctive relief and attorney's fees.

**i. Unreimbursed Business Expenses Claim**

"An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties …." CAL. LAB. CODE § 2802 (a). Ramos's Complaint alleges that he incurred expenses for the purchase of hand tools that were necessary to perform his job with Defendants and was never reimbursed for the costs of those tools. (Ramos Complaint, ¶¶ 18, 21-22). The

declaration submitted in support of this Motion states that he incurred approximately $2,000 for those tools. (Ramos Dec'l, ¶ 4).

Based on the above, Ramos's unreimbursed business expense claim puts in controversy $2,000.

**ii. Unpaid Double Minimum Wage Claim**

The minimum wage for employees fixed by the IWC is the minimum wage to be paid to employees, and the payment of a wage less than the minimum so fixed is unlawful. CAL. LAB. CODE §§ 1182.12, 1194, 1197, 1197.1, and 1198.

"When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft." IWC Wage Order 4-2001, § 9 (B).

Ramos's Complaint alleges that he is owed $18,400 in unpaid double minimum wage and $18,400 in liquidated damages, for a total of $36,800. (Ramos Complaint, ¶¶ 34-43).

Based on the above, Ramos's unpaid double minimum wage claim puts in controversy $36,800.

**iii. Unfair Competition Claim**

"Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." CAL. BUS. AND PROF. CODE § 17203.

Ramos's Complaint seeks "preliminary and permanent injunctive relief, including orders that the Defendants account for, disgorge, and restore to the Plaintiff those wages which he was legally entitled to, but were not paid, unreimbursed money for the purchase of tools and other amounts and benefits unlawfully withheld from him." (Ramos Complaint, ¶ 27). The cost for Defendants to comply with Ramos's sought injunctive relief would be $18,400 (the amount of unpaid double minimum wages that would be disgorged) and $2,000 (the amount that would be ordered reimbursed to cover the cost of his hand tools).

To the extent that such alternate remedies can be considered in calculating the amount in controversy, Ramos's unfair competition claim puts in controversy $20,400.

**iv. PAGA Claim**

"The civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation." CAL. LAB. CODE § 2699 (f) (2).

Ramos's Complaint seeks PAGA penalties of $100 for each aggrieved employee per pay period for the initial violation California Labor Code §§ 510, 1182.12, 1194, 1194.2, 1197 and 2802, and $200 for each aggrieved employee per pay period for each subsequent violation of these Labor Code sections. Ramos estimates that there were no less than 40 maintenance employees against whom Defendants committed violations of these Labor Code sections during the relevant time period. (Exhibit 1 to Ramos's Motion). Assuming these minimum of 40 employees worked only one pay period during the relevant time period, and that one violation of California Labor Code §§ 510, 1182.12, 1194, 1194.2, 1197 and 2802 was committed against each of these employees during that one pay period, the amount of PAGA penalties recoverable would be $24,000 ($100 penalty x 6 Labor Code sections = $600 x 40 initial pay periods). However, if each of these 40 employees worked 52 pay periods, the penalties recoverable would be $2,472,000 ($24,000 + [$200 penalty x 6 Labor Code sections = $1,200 x 2,040 pay periods]).

Based on the above, Ramos's PAGA claim puts in controversy no less than $24,000 and up to $2,472,000.

**v. Attorney's Fees**

"A court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met." *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018).

"At a rate of $400/hour, attorneys' fees would reach $40,000 after just 100 billable hours, and attorneys handling wage-and-hour cases typically spend far more than 100 hours on the case." *Lippold v. Godiva Chocolatier, Inc.*, No. C 10-00421 SI, at *6 (N.D. Cal. Apr.

15, 2010); *Cagle v. C&S Wholesale Grocers, Inc.*, No. 2:13-cv-02134-MCE-KJN, at *18 (E.D. Cal. Feb. 18, 2014) ("attorneys handling wage-and-hour cases typically spend far more than 100 hours on the case"). *See Martin v. The Old Turner Inn*, 2003 WL 22998402 (Cal. Sup. 2003) (awarding $147,610 in attorneys' fees and costs in a single-plaintiff wage and hour case in which the plaintiff recovered $49,508 in compensatory and punitive damages); *see also Bandoy v. Huh*, 1996 WL 675978 (Cal. Sup. 1996) (awarding $73,680 in attorneys fees in a wage-and-hour employee misclassification case in which the plaintiff recovered in excess of $200,000 in unpaid wages).

Ramos's Complaint seeks statutory attorney's fees pursuant to Labor Code §§ 1194, 2802 and 2699. (Complaint Prayer, ¶¶ 3, 7). Ramos's counsel charges an hourly rate of $600, which has been approved by various state courts. (Pimentel Dec'l, ¶ 5). Thus, if the Court were to use 100 hours as a reasonable, conservative estimate of the amount of time that would be spent this case, the attorney's fees in controversy would be no less than $60,000. This estimate is particularly low given the fact that the 100-hour estimate used by various district courts are for single plaintiff individual wage & hour claims, whereas Ramos's case involves a representative PAGA claim. For that reason, a more realistic conversative estimate of the number of hours that would be spent on this case is 150. At a rate of $600 per hour, that would equate to no less than $90,000 in fees.

Based on the above, Ramos's attorney's fees puts in controversy no less than $90,000.

**vi. Statutory Penalties**

"Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty as follows: **(1)** For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. **(2)** For each subsequent violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages." CAL. LAB. CODE § 558 (a).

Ramos's Complaint seeks penalties under California Labor Code § 558 (a). (Complaint Prayer, ¶ 8). Ramos estimates that there were no less than 40 maintenance employees against whom Defendants committed double minimum wage violations during the relevant time period. (Pimentel Dec'l, ¶ 10; Exhibit 1 to Motion to Intervene). Assuming these minimum of 40 employees worked only one pay period during the relevant time period, and that one double minimum wage violation was committed against each of these employees during that one pay period, the amount of statutory penalties recoverable under California Labor Code § 558 (a) would be $2,000 ($50 penalty x 40 initial pay periods). However, if each of these 40 employees worked 52 pay periods, the penalties recoverable would be $206,000 ($2,000 + [$100 penalty x 2,040 pay periods]).

Based on the above, Ramos's statutory penalties claim puts in controversy no less than $2,000 and up to $206,000.

**vii. Prejudgment Interest**

"A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day …." Interest shall accrue at a rate equal to the weekly average one year constant maturity United States Treasury yield, but shall not exceed 7 percent per annum." CAL. CIV. CODE § 3287

Ramos's Complaint seeks "prejudgment interest on each of the foregoing at the legal rate from the date the obligation became due through the date of judgment in this matter." (Complaint Prayer, ¶ 6). Thus, this sum must be added when calculating the amount in controversy.

Based on the foregoing, the Court has an independent basis upon which to exercise jurisdiction over Ramos's Complaint-in-Intervention should it decide that Ramos is entitled to intervention.

**b. Ramos, in His Capacity as Proxy for the State, Is Authorized to Intervene on its Behalf to Protect Its Interests**

Defendants pretend as if Ramos's Motion argues that he has a personal,

individualized protectable property right in his PAGA claim. This argument is so off the mark and nonresponsive to the argument Ramos actually made in his Motion that it appears to be a cookie cutter argument counsel made in some other case that he forgot to delete from his Opposition. That is the only explanation for how off topic this argument is. Ramos's Motion does not contend that his right to intervene stems from any personal property interest. Rather, his Motion quite clearly and unambiguously conveys that because the state has an interest in a potential Clark settlement, and he is authorized to act on the state's behalf as its proxy, that he therefore has standing to intervene on behalf of the state to represent its interests.

Aside from mischaracterizing Ramos's standing argument, Defendants' argument also ignores basic agency principals. "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." CIV. CODE § 2295. "An agent may be authorized to do any acts which his principal might do …." CIV. CODE § 2304. "An agent has such authority as the principal … confers upon him." CIV. CODE § 2315. "An agent has authority: To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency" CIV. CODE § 2319.

Ramos's proxy status is the reason he has an interest in the transaction. Indeed, because Ramos is acting as an "agent of the state" and "represents the same legal right and interest" as the state, any interest that the state has in the Clark settlement is, by proxy, "his." *Iskanian v. CLS Transp. L.A., LLC*, 173 Cal.Rptr.3d 289, 310 (2014). As such, Ramos, on behalf of the state, has an interest in this suit.

**c. Ramos is Not a Party to this Suit**

Defense counsel knocks down the entire house of cards he built in the "lacks personal interest" section of his Opposition by shamelessly contradicting the premise upon which that argument is based. Indeed, in the prior section of the Opposition, Defendants repeatedly claim that it is the state, and not Ramos, that has an interest in this suit, and that Ramos therefore lacks standing to intervene. That argument deliberately ignores that Ramos is acting as a proxy for the state, and that as the state's proxy, he represents the same legal

right and interest as it. However, in the next section of its argument, Defendants argue that because Ramos is the state's proxy, acting on its behalf, he is in fact already a "party" to this suit by virtue of Clark's PAGA action. Despite Defendants' convenient failure to recognize Ramos's proxy status in the "lacks personal interest" section of their argument, and recognition of that proxy status in the next section of its argument, Clark's PAGA claim does not render Ramos a party to his suit. The fact that Clark has been authorized to act on the LWDA's behalf does not preclude Ramos, who is also authorized to act on its behalf, to intervene. Indeed, Clark's authority to represent the LWDA extends only to a discrete one-year time period, which does not fully overlap with Ramos's one-year time period. Thus, the two PAGA representatives are authorized to represent the LWDA during separate and distinct periods of time. Further, the subject matter of Clark and Ramos's PAGA claims are completely different. Indeed, Ramos's PAGA claim, for example, seeks civil penalties for Defendants' failure to reimburse for hand tools, whereas Clark's PAGA claim seeks civil penalties for Defendants' failure to reimburse for steel-toed boots. Thus, although both are authorized PAGA representatives, the scope of their respective charters are different. Consequently, they are not "duplicate" proxies and Ramos is not a party to this suit.

**d. Ramos Never Claimed to Have Protectable Interest as an Aggrieved Employee**

Ramos's Motion has not claimed that his status as an aggrieved employee to Clark's PAGA action gives him standing to intervene. His Motion argues that his status as a PAGA representative in his own PAGA action gives him standing to intervene. As such, Defendants' arguments that Ramos's status as an aggrieved employee fails to confer standing to intervene are irrelevant.

**e. Intervention is Timely**

**i. Stage of Proceedings Militates in Favor of Intervention**

Defendants claim that the stage of the proceedings militates against intervention because the parties have invested significant time and resources in discovery and have engaged in substantial motion practice. What this argument fails to recognize is that Ramos

is not purporting to intervene to conduct any discovery or to engage in any motion practice. Thus, it is irrelevant that discovery has been conducted and motions have been argued. These arguments would only have any relevance if the predicate for Ramos's intervention was to conduct discovery or otherwise litigate the merits of the case. Ramos does not seek to do any of those things. Thus, why does it matter how much discovery has been conducted or how many motions have been briefed? Ramos is intervening to prevent a potential settlement between Clark and Defendants from impermissibly extinguishing PAGA claims that are barred by Clark's one-year statute of limitations and that artificially overlap into time periods that are not barred by Ramos's one-year statute of limitations. Thus, since the reason for Ramos's intervention is to prevent an improper settlement from occurring, and the parties had not yet even discussed settlement at the time the Motion to Intervene was brought, the Motion is arguably a bit early, not late. Consequently, the stage of the proceedings militates in favor of intervention.

**ii. Intervention at this Stage, as Opposed to an Earlier Stage, Does Not Cause Any Prejudice**

Defendants manufacture a prejudice argument by claiming that "The parties have already endured years of hard-fought litigation <u>based on the assumption that neither Ramos, nor any other party for that matter, have any interest in attempting to intervene</u>. In other words, Defendants always assumed that Ramos had no reason to intervene. However, further down in Defendants' Opposition, Defendants make a contradictory claim that "Ramos did not act promptly after numerous events giving him reasons to know of the potential impact of this ligation on his interests." (Opposition, p. 21:18-19). Thus, Defendants claim on the one hand that they always assumed that Ramos never had a reason to intervene, yet on the other hand, claim that Ramos should have known his interests would potentially be impacted by the Clark litigation. Putting aside these contradictions, Defendants fail to articulate why Ramos's mere knowledge of the existence of the Clark suit, in and of itself, was sufficient to put him on notice that his interests would potentially be impacted by that litigation in light of well-settled appellate precedent holding that the

date the proposed intervenor learns of a lawsuit is not the starting point for determining the timeliness of intervention. *See Chamness*, 722 F.3d at 1121.

The only other argument Defendants put forth in support of their claim of prejudice is that it will "disrupt the final stages of litigation and any potential settlement proceedings." This is no grounds to deny intervention. Indeed, several circuit courts, as well as the California Supreme Court have reinforced the principal that objectors/intervenors are a welcome part of the settlement process, and in fact ease the burden of settlement approval on the trial court. "After a proposed settlement has been reached, the plaintiffs and defendants are no longer adversaries. 'In such circumstances, objectors play an important role by giving courts access to information on the settlement's merits.' ( *Bell Atlantic Corp. v. Bolger* (3d Cir. 1993) 2 F.3d 1304, 1310 ; see *Redman v. RadioShack Corp.* (7th Cir. 2014) 768 F.3d 622, 629 ['When there are objecting class members, the judge's task is eased because he or she has the benefit of an adversary process: objectors versus settlors.']; Fitzpatrick, *The End of Objector Blackmail?* (2009) 62 Vand. L.Rev. 1623, 1630 (hereafter Fitzpatrick) ['[W]ithout objectors there would be no adversarial testing of class action settlements at all.'])." *Hernandez v. Restoration Hardware, Inc.*, 4 Cal.5th 260, 274-75 (2018).

Absent from Defendants' prejudice analysis is any mention of how Ramos's intervention at an earlier stage of the proceedings would have been any less prejudicial than it allegedly is now. Indeed, had Ramos intervened 1 ½ years ago on the same grounds as set forth in his Motion, and engaged in no discovery, participated in no motions and otherwise failed to participate in the merits of the suit (as he intends to proceed now), what difference does it make that he is intervening now as opposed to then? The Opposition does not say. If the only purpose of intervention is to prevent an improper settlement from occurring, and settlement has not yet occurred, what does it matter that intervention was sought now as opposed to 1 ½ years ago? The Opposition does not say.

**iii. There Was No Delay in Intervention**

Despite binding Ninth Circuit precedent holding that the date the proposed intervenor

learns of a lawsuit is not the starting point for determining the timeliness of intervention (*Chamness*, 722 F.3d at 1121), Defendants' Opposition continues to use that as the starting point. Defendants claim that "Ramos knew well before October 2020 of the potential impact on his PAGA claim as a result of the Clark litigation." Defendants then cite to various events that transpired in the Clark litigation that allegedly support this theory. But the Opposition never specifies why Ramos's mere knowledge of the existence of this litigation, or any of the events that transpired thereafter, put him on notice that his PAGA claim might be impacted by the Clark suit. Ramos concedes that his knowledge of the existence of the Clark suit did put him on notice that Clark might release portions of Ramos's PAGA claim that overlap with Clark's (as he is entitled to do). But how is it that Ramos's mere knowledge of the existence of this suit, or alleged knowledge of the filing amended complaints or motions put him on notice that Clark would impermissibly attempt to release non-overlapping portions of Ramos's PAGA claim (which Clark is not entitled to do)? Should every litigant simply presume that another litigant will always take some improper action that will impair their rights? That is not the assumption under which Ramos was operating and courts should not require litigants to operate under such an assumption. Indeed, such an approach to intervention would result in premature litigation of issues that may not warrant litigation.

The only reason Ramos had any reason to know that his PAGA claim would be impacted by a potential Clark settlement is because of a conversation he had with Clark's counsel about an unrelated issue that concerned the stay in Ramos's state court action. It was in that phone call that Ramos's counsel learned that Clark *might* release portions of Ramos's PAGA claim that have no overlap with Clark's. But prior to that point, nothing remarkable had occurred that would give Ramos any cause to believe the nonoverlapping portions of his PAGA claim would be released. Thus, Defendants' attempt to move the intervention goalpost is unavailing. The proper starting point for determining the timeliness of intervention is October 2020—the date Ramos's counsel first learned of Clark's intentions to potentially release nonoverlapping PAGA claims.

**f. Clark Will Not Adequately Protect Ramos's Interests**

Despite that Ramos and Clark have separate interests with respect to Clark's potential settlement (i.e., Clark wants to release Ramos's nonoverlapping PAGA claims for no consideration, while Ramos opposes this), Defendants claim that Clark will adequately protect Ramos's interests. In other words, Clark will protect Ramos from Clark. It is ridiculous for Defendants to engage in this fiction that Clark will protect Ramos's interests. How can the very person who is seeking to potentially extinguish Ramos's PAGA claim simultaneously "adequately protect" him from extinguishment of that claim? As illustrated above, Clark does not share the same objective as Ramos. Consequently, Clark will not adequately protect Ramos's interests.

**g. Intervention Should Not be Conditioned on Dismissal of Ramos's State Court Action**

Finally, Defendants claim that if the Court grants Ramos's Motion to Intervene, he should be required to dismiss his state court action because "he cannot maintain two separate actions alleging identical claims …." However, intervention does not result in separate identical claims. And in Ramos's case, he has a right to obtain intervenor status in order to protect against Clark and Defendants impermissibly releasing his PAGA claim in a future settlement. Thus, Ramos should not be required to dismiss his state court action if this Motion is granted.

## III. CONCLUSION

Based on the above, Plaintiff respectfully requests that the Court grant his Motion for Leave to Intervene.

**PIMENTEL LAW, P.C.**

Dated: October 24, 2020

By: [signature]

Gabriel J. Pimentel, Esq.
Attorney for Prospective Plaintiff-Intervenor
Elith Chris Ramos